**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.: _____

MICHAEL SEXTON,

      Plaintiff,

v.

CITY OF COLORADO SPRINGS, COLORADO a municipality,
RAYMOND LINGLEY, in his individual and official capacities,
MARVIN FORBES, in his individual and official capacities,
WILLIAM GIANNINI, in his individual and official capacities,
PETER TOMITSCH, in his individual and official capacities,
SCOTT WISLER, in his individual and official capacities,
TRACY TOTH, in his individual and official capacities, and
ROBERTO WILLIAMSON, in his individual and official capacities;

      Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

      Plaintiff Michael Sexton, by and through his counsel, Andy McNulty of KILLMER, LANE & NEWMAN, LLP, hereby submits his Complaint and Jury Demand, and states as follows:

**<u>INTRODUCTION</u>**

      *[T]he State has no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us...For, while the particular four-letter word being litigated here is perhaps more distasteful than most others of its genre, it is nevertheless often true that one man's vulgarity is another's lyric. Indeed, we think it is largely because governmental officials cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual.*

*Cohen v. California,* 403 U.S. 15, 26 (1971)

1.      Plaintiff Michael Sexton was subjected to a humiliating arrest for simply saying the four-letter word that the Supreme Court of the United Stated held, over fifty years ago in *Cohen*, is protected by the First Amendment: fuck.

2.      Mr. Sexton was detained, arrested, and searched by Colorado Springs Police Department ("CSPD") officers for saying "fuck the police."  Defendants then ensured that Mr. Sexton would be prosecuted for this constitutionally protected speech by instituting charges against him for allegedly violating the state's disorderly conduct statute. Those charges would only be dismissed after a year-long prosecution, which was clearly aimed at punishing Mr. Sexton for criticizing CSPD.

3.      This is not the first time that CSPD officers have targeted Mr. Sexton, and others, for simply criticizing them. Colorado Springs has a disturbing pattern of arresting individuals without probable cause and retaliating against those who criticize CSPD.

## JURISDICTION AND VENUE

4.      This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.

5.      Jurisdiction supporting Mr. Sexton's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

6.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this Complaint.

## PARTIES

7.      At all times relevant to this Complaint, Plaintiff Michael Sexton was a citizen of the United States of America and a resident of the State of Colorado.

8.      At all times relevant to this Complaint, Defendant City of Colorado Springs ("Colorado Springs") was a Colorado municipal corporation.

9.      At all times relevant to this Complaint, Defendant Raymond Lingley was a citizen of the United States and resident of the State of Colorado. At all relevant times, Defendant Lingley was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer for Colorado Springs, Colorado.

10.      At all times relevant to this Complaint, Defendant Marvin Forbes was a citizen of the United States and resident of the State of Colorado. At all relevant times, Defendant Forbes was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer for Colorado Springs, Colorado.

11.      At all times relevant to this Complaint, Defendants William Giannini was a citizen of the United States and resident of the State of Colorado. At all relevant times, Defendant Giannini was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer for Colorado Springs, Colorado.

12.      At all times relevant to this Complaint, Defendant Peter Tomitsch was a citizen of the United States and residents of the State of Colorado. At all relevant times, Defendant was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer for Colorado Springs, Colorado.

13.      At all times relevant to this Complaint, Defendants Scott Wisler was citizen of the United States and resident of the State of Colorado. At all relevant times, Defendant was acting

within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer for Colorado Springs, Colorado. Defendant Wisler was the supervisor-on-scene and responsible to supervising the actions of the other Defendants. Defendant Wisler condoned, ratified, and approved of the actions of the other Defendants.

14.     At all times relevant to this Complaint, Defendant Tracy Toth was a citizen of the United States and resident of the State of Colorado. At all relevant times, Defendant was acting within the scope of her official duties and employment and under color of state law in her capacity as a law enforcement officer for Colorado Springs, Colorado.

15.     At all times relevant to this Complaint, Defendants Roberto Williamson was a citizen of the United States and resident of the State of Colorado. At all relevant times, Defendant was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer for Colorado Springs, Colorado.

## FACTUAL ALLEGATIONS

16.     On January 30, 2019, Mr. Sexton was walking near the intersection of North Nevada Avenue and East Bijou Street in downtown Colorado Springs, Colorado. As he was walking, he observed two CSPD officers, Defendants Raymond Lingley and Marvin Forbes, operating a speed trap. Mr. Sexton began filming the officers. Mr. Sexton saw the officers perform traffic stops on two vehicles. The officers pulled the vehicles over on the right side of East Bijou Street, which is adjacent to Acacia Park.

17.     Mr. Sexton lawfully crossed, in the crosswalk and with the traffic signal, Bijou Street at Nevada Avenue. He walked along the sidewalk adjacent to the public park to the location where the officers were performing their traffic stops. Mr. Sexton stopped on the

sidewalk, approximately fifteen feet from the officers. As he walked past Defendant Lingley, Mr. Sexton said "Feel good about that? Harassing and taxing. These are innocent civilians." Defendant Lingley called dispatch to request a patrol unit and then resumed performing his traffic stop. Defendant Lingley continued to interact with the motorist.

18.     Mr. Sexton then continued down the sidewalk. As he did so, Mr. Sexton said  to Defendant Forbes, "doing your good deed for the day, you piece of shit?" Defendant Forbes asked if he could help Mr. Sexton. Mr. Sexton responded that Defendant Forbes should continue doing his job and that he would continue to stand on the sidewalk. Mr. Sexton criticized Defendant Forbes for "playing hide and seek" to write people tickets for speeding.

19.     As Defendant Forbes performed the traffic stop, Mr. Sexton criticized Defendant Forbes for ticketing drivers for barely exceeding the speed limit. Defendant Forbes told Mr. Sexton that he could call the police station to file a complaint. Mr. Sexton said that Defendant Forbes should do his job right and then the public wouldn't have to file complaints. Mr. Sexton told Defendant Forbes that police did not care about citizens but only about the "blue line." Defendant Forbes asked, "Would you like to be arrested for disorderly conduct" and told Mr. Sexton "you do not have the right to stand here and yell." Mr. Sexton responded that he had a right to free speech.

20.     At one point, Defendant Forbes approached Mr. Sexton and got right up into his face. When that happened, Mr. Sexton backed away from Defendant Forbes and asked Defendant Forbes to back up.

21.     Throughout the interaction with Defendant Forbes, Mr. Sexton stood on the sidewalk. Mr. Sexton never came between Defendant Forbes (or Defendant Lingley) and the

motorist he had pulled over. Mr. Sexton maintained a distance throughout the interaction and never left the sidewalk.

22.     Another CSPD officer, Defendant William Giannini, arrived based on Defendant Lingley's call for service. Defendant Giannini witnessed Mr. Sexton criticizing Defendant Forbes. Defendant Giannini heard Mr. Sexton yell "fuck the police." In response, Defendant Giannini told Mr. Sexton that saying the word "fuck" in public is profanity and using that word violates the disorderly conduct statute.

23.     Defendant Peter Tomitsch arrived shortly thereafter. Defendant Forbes told Defendant Tomitsch that Mr. Sexton was criticizing him. Defendant Tomitsch witnessed Mr. Sexton saying "fuck the police.".

24.     Defendant Giannini read and showed Mr. Sexton the statute for disorderly conduct, and told him that he was violating it. Specifically, Defendant Giannini told Mr. Sexton that he was violating the portion of C.R.S. § 18-9-106 that criminalizes anyone who "[m]akes a coarse and obviously offensive utterance, gesture, or display in a public place and the utterance, gesture, or display tends to incite an immediate breach of the peace."

25.     Mr. Sexton responded that he was acting lawfully and that the Supreme Court has said that saying the word "fuck" is protected speech.

26.     Defendant Giannini told Mr. Sexton that saying the word "fuck" on a public street is illegal. In response, Mr. Sexton reiterated that he had a First Amendment right to say "fuck the police."

27.     While Mr. Sexton was explaining that he had a constitutional right to say "fuck the police," Defendants Roberto Williamson and Tracy Toth arrived and conferred with the

6

officers on-scene about Mr. Sexton's actions. Through this conferral, Defendants Williamson and Toth knew exactly the speech and actions that Mr. Sexton was being investigated for engaging in.

28.     Eventually, Defendants Giannini and Tomitsch asked for Mr. Sexton's identification and then arrested Mr. Sexton. They did so because Mr. Sexton said the word "fuck." As he was being arrested and searched, Mr. Sexton told the officers he did not consent to search. He also asked that they not turn off his camera.

29.     Defendants Giannini and Tomitsch searched Mr. Sexton's pockets and backpack even though they had no reasonable suspicion to believe that he had committed a crime or was carrying a weapon. Defendant Williamson placed Mr. Sexton's possessions in a bag and Defendant Toth opened the door to put Mr. Sexton in a patrol car.

30.     Despite the fact that it was clear to them that Mr. Sexton had violated no law (and that there was no basis for searching his person), Defendants Williamson, Toth, Lingley, and Forbes did nothing to intervene to prevent Mr. Sexton's arrest and the searching of his person.

31.     After placing Mr. Sexton in handcuffs and then into a patrol car, Defendant Tomitsch requested supervisory backup. Defendant Scott Wisler responded to the scene. Defendant Tomitsch explained to Defendant Wisler that Mr. Sexton was yelling "fuck the police" from the sidewalk and that officers had arrested him for disorderly conduct. Defendant Wisler approved of the arrest and condoned his subordinates actions. Because of Defendant Wisler's decision, Mr. Sexton continued to be seized by Defendants and was not released from custody.

32.     Defendant Wisler then told Mr. Sexton that he would receive a citation for disorderly conduct and interference. Defendant Wisler instructed the other officers to take Mr. Sexton to the Gold Hill Division CSPD Station to serve him with the charge of disorderly conduct.

33.     While they were charging Mr. Sexton with disorderly conduct, Defendants Tomitsch and Giannini concluded that Mr. Sexton did not violate the interference statute. They also concluded that there was no probable cause to believe Mr. Sexton was obstructing an officer. Because of these conclusions, Defendant Tomitsch and Giannini did not charge Mr. Sexton with either of these crimes. However, they instituted charges against him for disorderly conduct despite it being obvious that Mr. Sexton had not committed the crime of disorderly conduct.

34.     After the arrest, Defendants Williamson and Toth took witness statements from individuals in the area. None of these individuals said that Mr. Sexton had caused a breach of the peace. In fact, one interviewee, the only one who heard clearly what Mr. Sexton was saying, told the officers that she heard Mr. Sexton saying the word" fuck" but that that word did not offend her.

35.     Despite the fact that these interviews confirmed that Mr. Sexton had violated no law, Defendants Williamson and Toth did nothing to intervene to prevent the continued detention, charging, and prosecution of Mr. Sexton.

36.     No pedestrians or nearby shop employees confronted Mr. Sexton while he was speaking. No passerby walked across the street to question Mr. Sexton. No cars stopped to watch Mr. Sexton. No one other than the officers on-scene talked to Mr. Sexton that day. Defendants

arrested Mr. Sexton for simply saying "fuck the police." Defendants arrested, searched, and charged Mr. Sexton with disorderly conduct because he would not change the content of his speech.

37.     Mr. Sexton faced prosecution for one year because of Defendants' unconstitutional arrest. On the eve of trial, the prosecution dismissed the case against Mr. Sexton because there was a lack of probable cause to believe that Mr. Sexton had committed any crime.

**Defendant Colorado Springs is municipally liable for the actions of Defendants Lingley, Forbes, Giannini, Tomitsch, Wisler, Toth, and Williamson.**

38.     All of the acts described herein were done by Defendants Lingley, Forbes, Giannini, Tomitsch, Wisler, Toth, and Williamson intentionally, knowingly, willfully, wantonly, maliciously and/or recklessly in disregard for Mr. Sexton's federally protected rights, and were done pursuant to the preexisting and ongoing deliberately indifferent custom, policy, practice, training, and supervision of Defendant Colorado Springs acting under color of state law.

39.     Defendant Lingley, Forbes, Giannini, Tomitsch, Wisler, Toth, and Williamson's treatment of Mr. Sexton was pursuant to Defendant Colorado Springs' customs and/or practices of unlawful conduct, including but not limited to:

   a.   Arresting and prosecuting individuals without probable cause to believe they have committed any crime;

   b.   Stopping, detaining, citing, and prosecuting individuals for engaging in speech activity that is critical of Colorado Springs and its agents and/or deemed offensive;

    c.  Maliciously prosecuting individuals without probable cause and, particularly, engaging in malicious prosecutions in an attempt to cover-up police misconduct; and

    d.  Failing to discipline officers, or even find officers engaged in wrongdoing, in the face of obvious constitutional violations.

40.    Upon information and belief, Defendant Colorado Springs has provided no additional training to Defendants Lingley, Forbes, Giannini, Tomitsch, Wisler, Toth, and Williamson, and its other officers related to the incident with Mr. Sexton.

41.    The unlawful conduct of Defendants Lingley, Forbes, Giannini, Tomitsch, Wisler, Toth, and Williamson, as set forth in detail herein, amounts to a custom and widespread practice, even if not authorized by written law or express municipal policy, so permanent and well settled as to constitute a custom or usage with the force of law.

42.    Through the Defendant Colorado Springs' continuous ratification of unconstitutional detentions, arrests, prosecutions, excessive force, and stifling of free speech, Defendant Colorado Springs has condoned Defendant Lingley, Forbes, Giannini, Tomitsch, Wisler, Toth, and Williamson's conduct.

43.    Defendant Colorado Springs failed to properly train and supervise its employees to avoid inhibiting free speech and the use of excessive force, unlawful seizure, and unlawful search.

44.    Defendant Colorado Springs knew, or should have known, that its employees would retaliate against Mr. Sexton's free speech, unlawfully seize, arrest, and prosecute Mr. Sexton, and unlawfully search Mr. Sexton, violating Mr. Sexton's constitutional rights.

45.     Defendant Colorado Springs was deliberately indifferent to Plaintiff's constitutional rights, because Colorado Springs knew that individuals in Plaintiff's position would be at a substantial risk of suffering dangerous consequences from Colorado Springs' failure to properly train and supervise its employees.

46.     Defendant Colorado Springs could have and should have pursued reasonable methods for the training and supervising of such employees but failed to do so.

47.     Defendant Colorado Springs' policies, customs, or practices in failing to properly train and supervise its employees were the moving force and proximate cause of the violation to Mr. Sexton's constitutional rights.

48.     The custom, policy, and practice of Defendant Colorado Springs of encouraging, condoning, tolerating, and ratifying the retaliation, detention, use of excessive force by law enforcement officers and the unlawful seizure, search, and false arrest of citizens, as described herein were the moving force behind, and proximate cause of, the violation to Mr. Sexton's constitutional rights.

49.     The acts or omissions of Defendant Colorado Springs caused Mr. Sexton damages in that he suffered physical and mental pain, among other injuries, damages, and losses.

50.     The actions of Defendant Colorado Springs as described herein deprived Mr. Sexton of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused him other damages.

**Defendant Colorado Springs has a custom and practice of targeting Mr. Sexton specifically, arresting him, and maliciously prosecuting him for engaging in speech that is critical of CSPD officers.**

51.     On June 7, 2019, Mr. Sexton was leaving the 7-11 near the intersection of 30th Street and Colorado Avenue in Colorado, Springs, Colorado. As he stood in the parking lot, Officer Matthew Anderson, a CSPD officer, drove by in a police car.

52.     As Officer Anderson drove by, Mr. Sexton flipped off Officer Anderson.

53.     Immediately after seeing Mr. Sexton flipping off the car, Officer Anderson made an illegal U-turn across four lanes of traffic to contact Mr. Sexton and ask if he needed any help.

54.     Mr. Sexton told Officer Anderson that he did not need help, and Anderson began to drive away on 30th Street.

55.     As Officer Anderson drove away, Mr. Sexton looked both ways and, seeing no cars in the area, safely crossed 30th Street.

56.     Again, Officer Anderson made another illegal U-turn and drove toward Mr. Sexton, at which point Mr. Sexton began recording the incident on his phone.

57.     As Officer Anderson approached, Mr. Sexton flipped him off again while standing on the sidewalk.

58.     Immediately after Mr. Sexton flipped him off again, Officer Anderson activated the police lights on his car and pulled over.

59.     Officer Anderson jumped out of his vehicle and grabbed Mr. Sexton. Officer Anderson used force against Mr. Sexton within seconds of the initiation of the interaction. Officer Anderson pulled Mr. Sexton to the police car by his wrist and shoved Mr. Sexton against, and over, the hood of his vehicle.

60.     Though Mr. Sexton repeatedly asked Officer Anderson to please "calm down," he escalated the situation by using excessive force because he was angry that Mr. Sexton had

flipped him off and filmed him. Officer Anderson pinned Mr. Sexton to the hood of the car and wrenched his arm behind his back. Mr. Sexton continued to tell Anderson that he was not fighting him, indicated that he was not resisting arrest with his body language, and asked Anderson not to rough him up.

61.     Officer Anderson placed Mr. Sexton in handcuffs and directed another officer to search Mr. Sexton's pockets, even though there was no reason to suspect that he had a weapon or had committed a crime.

62.     Officer Anderson asked Mr. Sexton, "why were you making obscene gestures the whole time" while continuing to use force against him and detain him in handcuffs. During this encounter, Mr. Sexton pointed out another individual crossing the street just as Mr. Sexton had crossed the street. Though there were multiple officers on scene, no officers arrested or spoke with the other individual.

63.     After a half an hour, Officer Anderson released Mr. Sexton from handcuffs and issued a citation for jaywalking under COLO. SPRINGS MUN. CODE 10.18.104. Colorado Springs prosecuted Mr. Sexton for almost three months before dismissing the charges against him for a lack of probable cause.

### **Defendant Colorado Springs has a custom and practice of arresting individuals in retaliation for their exercise of their First Amendment rights, particularly in response to criticism of police activity.**

64.     CSPD has a history of retaliating against individuals who criticize police officers and/or record their misconduct—an issue that should have long since been addressed by Defendant Colorado Springs. The following cases show that at the time of Mr. Sexton's arrest, there was an informal custom and practice, that was known to Defendant Colorado Springs, of

retaliating against individuals who protest police officers and/or record their misconduct. These cases also illustrate an obvious need, that Defendant Colorado Springs was aware of at the time of Mr. Sexton's arrest, for Defendant Colorado Springs to provide further training to CSPD officers on the necessity of not retaliating against individuals who protest police officers and/or record their misconduct.

65.     On July 4, 2013, Grant Bloomquist was arrested without probable cause after he verbally protested two CSPD officers' beating of another man outside of a nightclub. Mr. Bloomquist walked outside of Cowboys Night Club in downtown Colorado Springs and saw officers brutally beating a black man, so he stepped to about 7 feet away and said, "get the fuck off him." At that point, he was blindsided and struck by an officer, who hit him right in the face. Multiple CSPD officers then struck Mr. Bloomquist repeatedly in the groin area with knee strikes and pinned him against a police vehicle. The officers then threw him in the police car and arrested him. These actions were taken by CSPD officers because Mr. Bloomquist was criticizing the CSPD.

66.     On March 25, 2015, CSPD officers unlawfully arrested and brutalized Ryan Brown because he filmed a traffic stop, protested CSPD officers' misconduct during that traffic stop, and asserted his rights. Mr. Brown was in the passenger seat of a vehicle that was pulled over because his brother (the driver of the vehicle) and himself were black men driving through a predominantly white neighborhood in Colorado Springs. Once CSPD officers initiated the stop, Mr. Brown immediately asked them why the vehicle had been pulled over and started filming. In response to this free speech activity, the CSPD officers held Mr. Brown at gunpoint, forced him out of the vehicle, slammed him into a snowy parkway, and stopped his recording. These actions

were taken by CSPD officers because Mr. Brown was criticizing the CSPD. Mr. Brown filed a lawsuit against Colorado Springs. Colorado Springs settled Mr. Brown's claims against the officers and itself.

      67.    On November 2, 2017, Terrell Clayton was arrested for simply filming police activity in Colorado Springs and protesting police officers who attempted to intimidate him into taking actions he was not legally required to take, namely providing CSPD officers with identification. On that day, Mr. Clayton drove to the CSPD substation at 7850 Goddard Street, Colorado Springs, Colorado. Mr. Clayton set out to film officers, and the station itself, for his YouTube channel. To do so, he carried with him a handheld camera and his cellphone. Mr. Clayton was filming outside of the substation when he was approached by two CSPD officers. When they approached Mr. Clayton, the officers almost immediately asked Mr. Clayton for identification. Mr. Clayton politely refused, correctly informing the officers that they needed reasonable suspicion that he had committed a crime in order to demand identification from him. One officer responded that the officers had reasonable suspicion that Mr. Clayton had committed a crime because he was "outside of a law enforcement facility acting suspicious." He falsely told Mr. Clayton that acting "suspicious" meets the elements of the crime of disorderly conduct. They then told Mr. Clayton that he was "required" to identify himself. Mr. Clayton told the officers that he had a constitutional right to record police activity and that he would not produce identification without reasonable suspicion that he had committed a crime. Immediately after Mr. Clayton's assertion of his rights, the officers forcibly detained him. They aggressively searched Mr. Clayton and seized his camera, placing it on the trunk of the police car. The officers then placed Mr. Clayton in the back of their police car. While in the back of the police car, Mr.

Clayton began filming on his cell phone. As one of the officers was speaking to Mr. Clayton, while Mr. Clayton was detained against his will in the back of the police car, the officer falsely told Mr. Clayton that his detention was a *Terry* stop. The officer then seized Mr. Clayton's cell phone and stopped his recording. Unbeknownst to the officers, Mr. Clayton's camera (which had been seized initially by the officers and placed on the trunk of their police car) was continuing to film. On film, the officers stated that, if Mr. Clayton didn't provide his identification, they were going to book him into jail. Sergeant Pratt then told the other officers that he didn't want to hear Mr. Clayton "barkin' laws and all that." Sergeant Pratt then, seemingly knowing that his detention of Mr. Clayton was unconstitutional, told the other officers that "if this ends up going to the court bullshit... then literally fuck my life." Sergeant Pratt then told Officer Pugsley to "keep him detained out here." The officers eventually told Mr. Clayton that he had a choice: either provide his name and identification or spend the evening in jail. Despite his belief that the officers had no reasonable suspicion to require him to produce identification, Mr. Clayton eventually provided the officers with his identification so as to avoid spending the night in jail. He was then released with no citation. Mr. Clayton has never been cited, or charged, with any crime arising out of the incident on November 2, 2017.

68.    In 2016 and 2017, Colorado Springs, and its officials (including its City Council and City Attorney), retaliated against Leslie Weise for blowing the whistle on a government entity engaged in the slow-poisoning of Colorado Springs' residents. Initially, Ms. Weise was simply attempting to learn if the municipally owned and operated power plant near her son's school was emitting unsafe levels of pollution, as all of the existing data available to the public at that time indicated was the case. In an effort to learn what information Colorado Springs

possessed about the Martin Drake Power Plant's pollution, she filed an open records request,

seeking any studies that would detail whether Colorado Springs Utilities knew whether the

Martin Drake Power Plant was in compliance with standards set out by the Environmental

Protection Agency. Instead of providing Ms. Weise with just such a report (which was in their

possession having been recently commissioned and received from their contracted air quality

services vendor), Colorado Springs has covered up and buried the report while issuing a blanket

denial of her request for the public information. Doggedly, Ms. Weise pursued the release of

these records through the state courts. After having her request denied again at the district court

level, Ms. Weise appealed the ruling. During the appeal, the clerk for the Colorado Court of

Appeals sent Ms. Weise the record on appeal. As she was observing the documents sent by the

clerk, Ms. Weise noticed an air quality report that turned out to be the report she had been

seeking all along. She also noticed that the report confirmed her suspicions: the Martin Drake

Power Plant was determined to be violating the Environmental Protection Agency's National

Ambient Air Quality Standard for sulfur dioxide pollution and was emitting this pollution in an

area where Ms. Weise's child attended school, among other areas where many people were being

exposed to unsafe air quality. Recognizing that the Clerk of the Court of Appeals may have

mistakenly sent her the very report Defendant Colorado Springs was attempting to hide from the

public, Ms. Weise immediately sought guidance from the Court of Appeals to determine what

she should do with the additional records. The Colorado Court of Appeals' order required that

both parties return the disc they had been mailed. Ms. Weise was further ordered to not distribute

the sealed material, nor download, retain, or disseminate the record. The Colorado Court of

Appeals did not order that Ms. Weise could not discuss the sealed material or share any publicly

Case No. 1:20-cv-02248-WJM-KLM   Document 1   filed 07/30/20   USDC Colorado   pg 18 of 28

filed motions she had submitted. Ms. Weise then contacted the Colorado Springs Gazette. She shared the motions she had filed when seeking clarification on what to do with the additional documents. Based on these motions and comment provided by Ms. Weise, the reporter published a story exposing the Martin Drake Power Plant as a public nuisance that was actively harming Colorado Springs residents by emitting unsafe levels of pollution. Importantly, Ms. Weise did not share the documents she had received from the clerk with the reporter, or anyone else subsequent to the Court of Appeals' orders. In response to the Colorado Springs Gazette article, Colorado Springs began a campaign of retaliation against Ms. Weise, simply because she legally spoke out on a matter of important public concern. Over the next six months, one or more Colorado Spring City Council members stated publicly that Ms. Weise's statement regarding the emissions at the Martin Drake Power Plant were lies. Another City Council member stated that Ms. Weise committed a crime when she disclosed the information about the harmful emissions at the Martin Drake Power Plant, and that she knew she was committing a crime when she did so. A spokeswoman for Colorado Springs Utilities also defamed Ms. Weise, stating that she violated the law. Colorado Springs continued retaliation culminated in March and April 2017, when the Colorado Springs City Council voted to take formal action to seek that Ms. Weise be disciplined with the professional associations in the multiples states outside of Colorado Ms. Weise had been admitted to practice law and presently holds (or previously held) professional licensure, accusing her of professional misconduct and violations of the law. The City Attorney herself, Wynetta Massey, sent these complaints using taxpayer resources and on official Colorado Springs letterhead. Each one of these actions were undertaken to retaliate against Ms. Weise for legally

and rightly speaking out on a matter of public concern. All told, this campaign against Ms. Weise has cost Colorado Springs taxpayers at least one hundred thousand dollars in public funds.

69.     Several of these representative cases resulted in the City of Colorado Springs paying hundreds of thousands of dollars to settle retaliation claims, yet the facts surrounding Mr. Sexton's case make apparent that the CSPD has yet to learn its lesson and adequately train its officers on the requirements of the First Amendment.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – First Amendment Violation
### Free Speech
*Plaintiff Against All Defendants*

70.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

71.     At all times relevant to this Complaint, Defendants were acting under the color of law.

72.     Plaintiff was engaged in First Amendment-protected speech in saying "fuck the police."

73.     Plaintiff's speech was on a matter of public concern and did not violate any law.

74.     By stopping, detaining, and handcuffing Plaintiff, issuing Plaintiff a citation for disorderly conduct, and initiating the prosecution of Plaintiff, Defendants chilled Plaintiff from exercising his First Amendment rights, including his right to speak freely. Being stopped, issued a citation for disorderly conduct, and prosecuted would chill a person of ordinary firmness from exercising his or her First Amendment rights.

75.     The state disorderly statute, C.R.S. § 18-9-106, is unconstitutional as-applied to Plaintiff's speech.

76.     C.R.S. § 18-9-106 is also facially overbroad in violation of the First Amendment.

77.     C.R.S. § 18-9-106 criminalizes anyone who "[m]akes a coarse and obviously offensive utterance, gesture, or display in a public place and the utterance, gesture, or display tends to incite an immediate breach of the peace."

78.     Defendants' stop of Plaintiff, detention of Plaintiff, and issuance of a citation for disorderly conduct was a content-and/or viewpoint-based restriction on Plaintiff's speech.

79.     Plaintiff's speech occurred at a traditional public forum. Defendants' conduct violated clearly established rights belonging to Plaintiff of which reasonable persons in Defendants' position knew or should have known. The freedom of individuals to oppose or challenge police action, and to criticize public officials, has been clearly established for over thirty years. *City of Houston v. Hill*, 482 U.S. 451 (1987); *Cohen,* 403 U.S. at 26.

80.     Defendants who did not personally search, arrest, or initiate the prosecution of Plaintiff so as to chill his speech failed to intervene to prevent the other Defendants from doing so.

81.     Defendants engaged in this conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

82.     Defendant Wisler, as the supervisor on scene, caused, and is liable for, the actions of his subordinate officers.

83.    Defendants detained Plaintiff, arrested Plaintiff, issued him a citation for disorderly conduct, and initiated a malicious prosecution of Plaintiff because he said "fuck the police." These actions were in accordance with the customs, policies, and practices of Defendant Colorado Springs.

84.    Defendant Colorado Springs has a custom, practice, or police of tolerating violations of the First Amendment of the United States Constitution related to Plaintiff.

85.    Defendant Colorado Springs' customs, policies, and/or practices were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

86.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages. The acts and inactions of Defendants caused Plaintiff damages in that he was prevented from speaking freely on a matter of public concerns, among other injuries, damages, and losses.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – First Amendment Retaliation**
*Plaintiff Against All Defendants*

87.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

88.    At all times relevant to this Complaint, Defendants were acting under the color of law.

89.    Plaintiff was engaged in First Amendment-protected speech.

90.    Plaintiff's speech was on a matter of public concern and did not violate any law.

91.    Defendants responded to Plaintiff's First Amendment-protected activity was retaliation.

21

92.     Defendants' retaliatory actions were substantially motivated by Plaintiff's exercise of his First Amendment rights.

93.     Defendants sought to punish Plaintiff for exercising his First Amendment rights, to silence his future speech, to stop him from continuing to speak, and to restrict his freedom of expression, along with the future speech and expression of others. Defendants' retaliatory actions would chill a person of ordinary firmness from engaging in First Amendment-protected activity.

94.     Defendants' conduct violated clearly established rights belonging to Plaintiff of which reasonable persons in Defendants' position knew or should have known. Retaliation against an individual based on his First Amendment-protected speech has been clearly established in the Tenth Circuit for almost two decades. *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000).

95.     Defendants who did not personally search, arrest, or initiate the prosecution of Plaintiff in retaliation for his speech failed to intervene to prevent the other Defendants from doing so.

96.     Defendant Wisler, as the supervisor on scene, caused, and is liable for, the actions of his subordinate officers.

97.     Defendant Colorado Springs has a custom, policy, or practice of tolerating violations of the First Amendment of the United States Constitution related to Plaintiff.

98.     Defendant Colorado Springs' customs, policies, and/or practices were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

99.     Defendants engaged in this conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

100.    Defendants' action and/or omissions caused, directly and proximately, Plaintiff to suffer damages. The acts and inactions of Defendants caused Plaintiff damages.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourth Amendment
### Unreasonable Seizure
*Plaintiff Against All Defendants*

101.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

102.    At all times relevant to this Complaint, Defendants were acting under the color of law.

103.    Defendants initiated a stop of Plaintiff without reasonable suspicion to believe he was committing any crime.

104.    Defendants did not have probable cause or any other legal basis to believe that Plaintiff had committed or was committing any violating of the law prior to initiating a stop of Plaintiff and arresting him.

105.    Defendants had no warrant authorizing him to contact Plaintiff.

106.    Defendants who did not personally detain or arrest Plaintiff failed to intervene to prevent the other Defendants from searching Plaintiff without reasonable suspicion, a warrant, probable cause, or exigent circumstances.

107.    No legally recognizable exigent circumstances existed which would have justified or permitted Defendants' conduct.

108.    Defendants' actions were objectively unreasonable in light of the circumstances confronting him.

109.     Defendants' intentional, willful, and wanton seizure of Plaintiff, as described herein, was solely based on Plaintiff's exercise of his First Amendment rights.

110.     Defendant Wisler, as the supervisor on scene, caused, and is liable for, the actions of his subordinate officers.

111.     Defendant Colorado Springs has a custom, practice or policy of tolerating violations of the Fourth Amendment of the United States Constitution related to Plaintiff.

112.     Defendant Colorado Springs' customs, policies, and/or practices were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

113.     Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages. The acts and inactions of Defendants caused Plaintiff damages.

### FOURTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourth Amendment
### Unlawful Search
*Plaintiff Against Defendants Lingley, Forbes, Giannini, Tomitsch, Toth, and Williamson*

114.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

115.     Defendants were acting under color of state law in their actions and inactions which occurred at all times relevant to this action.

116.     Plaintiff has a legitimate expectation of privacy in his body and his property being free from unreasonable governmental search.

117.     Defendants had no warrant authorizing any such search of Plaintiff's body or property.

118.     No legally recognizable exigent circumstances or other legal justification existed which would have justified or permitted Defendants' conduct.

119.     Defendants' actions were objectively unreasonable in light of the circumstances confronting him.

120.     Defendants who did not personally search Plaintiff failed to intervene to prevent the other Defendants from searching Plaintiff without reasonable suspicion, a warrant, or exigent circumstances.

121.     Defendants engaged in these actions intentionally, willfully, and wantonly.

122.     As a legal and proximate cause of Defendants' actions, Plaintiff has suffered and continues to suffer humiliation, emotional distress, loss of enjoyment of life, and other significant injuries, damages, and losses.

### FIFTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourth Amendment Violation
### Malicious Prosecution
*Plaintiff Against All Defendants*

123.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

124.     At all times relevant to the subject matter of this Complaint, Defendants were acting under color of state law in their capacities as officers with CSPD and within the scope of their employment.

125.     Defendants initiated charges against Mr. Sexton, knowing that there was no basis for those charges or probable cause to believe Mr. Sexton had committed any crime, by arresting Mr. Sexton and citing him with disorderly conduct.

126.     No probable cause supported Mr. Sexton's original arrest, confinement, or prosecution.

127.     Defendants' motivation was not to bring to justice a person thought to have committed a crime but for the purpose of punishing Mr. Sexton for criticizing the CSPD.

128.     Defendants acted with malice in initiating the charges against Mr. Sexton and his continued prosecution.

129.     Defendants made the above actions and omissions knowingly, maliciously, willfully and wantonly.

130.     Defendants who did not personally initiate the malicious prosecution of Plaintiff failed to intervene to prevent the other Defendants from doing so.

131.     Defendants' conduct violated clearly established rights belonging to Mr. Sexton of which a reasonable person in their positions knew or should have known.

132.     Defendant Wisler, as the supervisor on scene, caused, and is liable for, the actions of his subordinate officers.

133.     As a legal and proximate result of Defendants' actions or omissions described herein, including the unconstitutional custom, policy, or practice of making arrests without probable cause described above from which this malicious prosecution claim arises, Mr. Sexton has suffered and continues to suffer humiliation, lost earnings, emotional distress, loss of enjoyment of life, and other significant injuries, damages and losses.

134.     The charges against Mr. Sexton resulting from the actions/omissions of Defendants described herein were dismissed; thus, the original action against Mr. Sexton terminated in his favor.

135.     Defendants' actions caused Mr. Sexton damages.

136.    Defendant Colorado Springs has a custom, practice, or policy of tolerating violations of the Fourth Amendment of the United States Constitution, particularly condoning malicious prosecutions initiated by police officers without probable cause.

137.    Defendant Colorado Springs' customs, policies, and/or practices were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

138.    In addition to compensatory, economic, consequential and special damages, Plaintiff is entitled to punitive damages because the actions of Defendants were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and award him all relief as allowed by law, including, but not limited to the following:

a.   All appropriate relief at law and equity;

b.   A declaration that C.R.S. § 18-9-106 is unconstitutional, both facially and as-applied to the facts of this case;

c.   An injunction against enforcement of C.R.S. § 18-9-106;

d.   Actual economic damages as established at trial;

e.   Compensatory damages, including, but not limited to those for past and future pecuniary and non-pecuniary losses, physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, and sense of security and individual dignity, and other non-pecuniary losses;

f.   Punitive damages for all claims as allowed by law in an amount to be determined at trial;

g.   Issuance of an Order mandating appropriate equitable relief, including, but not limited to:

1. Issuance of a formal written apology from each Defendant to Plaintiff;

2. The imposition of policy changes designed to avoid future similar misconduct by Defendants;

3. Mandatory training designed to avoid future similar misconduct by Defendants;

h.   Pre-judgment and post-judgment interest at the highest lawful rate;

i.   Attorney's fees and costs; and

j.   Such further relief as justice requires.

## **REQUEST FOR TRIAL BY JURY**

Plaintiff demands a jury trial on all issues so triable.

Dated this 30th day of July, 2020.

KILLMER, LANE & NEWMAN, LLP

*s/ Andy McNulty*

_____
Andy McNulty
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
(303) 571-1001

ATTORNEY FOR PLAINTIFF